UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES EDWARDS,<br>Petitioner,<br>v.<br>DAVID BAUGHMAN,<br>Respondent. | Case No. 17-cv-06469-SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

**INTRODUCTION**

Charles Edwards filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his murder conviction. The court issued an order to show cause why the writ should not be granted. Respondent has filed an answer, and Edwards has filed a traverse. For the reasons discussed below, the petition will be DENIED.

**BACKGROUND**

A two-phase trial was held for Edwards, with the first phase being used to determine guilt and the second phase being used to determine sanity at the time of the offense. The same jury was used for both phases.

The California Court of Appeal described the crime as shown through evidence presented at trial during the guilt phase:

> At midday on May 7, 2012, defendant attacked Shannon Collins, a woman whom he did not know, as she was walking on Broadway in Santa Cruz. He stabbed her neck and torso 12 times. While Collins bled to death, defendant dropped his jacket and his knife near her body. He nonchalantly walked away and threw his blood-stained shirt into a garbage can. Shortly thereafter, defendant was arrested a few blocks away from the crime scene. Defendant had blood spatter on his hands, head, and shoes.

> Defendant was calm and cooperative during the in-field showups, which occurred about an hour after the offense. Defendant was then transported to a hospital for evidence collection procedures during which he was also cooperative. About one and a half hours later, he was transported to the police station where he coherently provided biographical data to the police officers.
>
> 2. Defense Case
>
> Defendant presented evidence of his extensive history of mental illness. His symptoms included hallucinations, paranoid thoughts, extreme mood fluctuations, and chronically aggressive behavior. Defendant had been given various diagnoses, including schizoaffective disorder bipolar type, schizophrenia, a psychotic disorder not otherwise specified, antisocial personality disorder, and polysubstance abuse. Defendant had engaged in 15 or 16 incidents of violent behavior between 1991 and 2002, many of which were related to his mental illness. Defendant was involuntarily medicated eight times between 1994 and 2011. He met the criteria for the mentally disordered offender program in 1999, 2000, 2002, and 2011. Defendant had no insight into his mental illness and he frequently did not take his medications.

*People v. Edwards*, 11 Cal. App. 5th 759, 761-62 (Cal. Ct. App. 2017) (footnote omitted).

The jury found Edwards guilty of first degree murder with personal use of a deadly weapon. After the jury rendered its guilty verdict on the murder charge, there was a brief court trial on the sentence enhancement allegations regarding prior felonies. A few days later, a trial was held before the same jury to determine whether Edwards was sane at the time of the killings. Most of the evidence in the sanity phase trial came from two psychiatrists who testified for the defense and two psychologists who testified for the prosecution.

The California Court of Appeal described the sanity-phase evidence:

> 1. Defense Case
>
> Dr. Jeffrey Gould, a psychiatrist, reviewed documentary evidence and met with defendant. In October 2014, defendant told Dr. Gould that he was hearing voices that told him he was a "liar," a "slouch," and a "piece of shit" on May 7, 2012. The voices began when he woke up that morning and became louder and louder during the day. According to defendant, "the voices were coming from two skeletons that were on the sides of head," and they told him to kill Collins as he stabbed her. Defendant told Dr. Gould that society was against him, and if he remained on the street he would be killed. Defendant believed that if he killed someone, he would be safe and would join the Illuminati cults. Defendant also claimed that the skeletons told him that if he killed someone, he would be free. Jail records, which included a daily account of defendant's behavior and mental condition after the incident, indicated to Dr. Gould that he was suffering from a psychotic disorder. Dr. Gould diagnosed defendant with schizophrenia. Dr. Gould opined that defendant's psychological disorder impaired his knowledge of the moral wrongfulness of his conduct. Defendant's delusions caused him to believe that killing Collins was morally right, and he was saving himself from death and persecution. On cross-examination, Dr. Gould acknowledged that he did not consider defendant's interview with the police on May 7, 2012, in reaching his opinion. When Dr. Gould wrote his report, he also did not have the statements that defendant made to Drs. Mark Burdick

and Jonathan French, prosecution expert witnesses. Dr. Gould conceded that defendant's statements to the police, Dr. Burdick, Dr. French, and to him were inconsistent, thus raising concerns regarding which version was valid.

Dr. Gould reviewed the video of defendant's statement to the police in which he did not mention the presence of skeletons, anyone telling him what to do, or the Illuminati. Dr. Gould believed that the statement that defendant gave to the police was likely to be the most reliable because it was made closest in time to the murder. Defendant told the police that he had planned to kill a woman because he was frustrated that women did not give him enough attention. He explained that "corrupt" men, men who weighed 300 pounds, and drug dealers received attention from women, but he did not. Defendant stated that he could not take it anymore, and he decided to kill a woman. Defendant also stated that he specifically stabbed Collins twice in the neck first. Dr. Gould conceded that defendant's statement that he would not have killed a teenager or a woman with a child was a moral decision. Defendant told the police that he knew what he did was wrong, that he was going to go to court, and that he would probably receive a life sentence. Defendant stated that he felt bad about what he had done, but he would have felt worse if Collins had had a husband or children. Defendant wrote a letter in the interview room in which he characterized what he did as an awful crime.

Dr. Gould observed that defendant was logical, coherent, and did not mention any psychotic symptoms during the police interview. Defendant's description of events "sounds like someone who is very antisocial and not suffering from other mental illness. . . ." Based on the police interview, Dr. Gould opined that defendant understood the nature of his act and knew legal and moral right from wrong at the time of the murder. However, Dr. Gould did not know whether defendant's statements to the police or to him were more reliable.

Dr. John Greene, a psychiatrist, testified that he evaluated defendant twice in December 2014 and twice in January 2015. Defendant told him that he was experiencing hallucinations and delusions prior to his arrest for murder and described symptoms similar to those that he had described to Dr. Gould. He visualized skeletons on either side of him telling him to kill or he would be killed. Defendant also suffered the delusion that there was a plot against him and that he needed to retaliate. Defendant believed that his life would no longer be in danger after he stabbed Collins. Defendant told Dr. Greene that he ran out of medication after he was released from Atascadero State Hospital in 2012 and was unable to obtain more medication. Defendant had a difficult time providing a rational account of events, which Dr. Greene interpreted to mean that he was "quite psychotic" at the time of the crime.

Dr. Greene noted that there was evidence of psychosis in defendant's interview with the police when he referred repeatedly to the plot against him. When defendant was talking about the crime, he used the words "plot" and "plotting against me" 14 times. Defendant also made three references to being part of a mission and two references regarding his belief that God was instructing him. On cross-examination, Dr. Greene conceded that defendant's statements to the police were linear when he gave his narrative about the crime. But Dr. Greene pointed out that many of defendant's medical records showed that he could be lucid and linear when he was psychotic. He noted that when defendant was left alone in the interview room, he was talking to himself for 10 minutes, which indicated that he was likely having auditory hallucinations. It appeared to Dr. Greene that defendant was suffering from delusions and hallucinations during the interview, which meant that he suffered from those delusions and hallucinations when the crime was committed. Dr. Greene also believed that defendant was trying to hide his symptoms from the police. Dr. Greene

diagnosed defendant with schizoaffective disorder, antisocial personality disorder, and substance abuse. Dr. Greene opined that defendant was unable to discern between moral right and wrong at the time of the offense due to his schizoaffective disorder.

2. Prosecution Case

Dr. French, a psychologist, diagnosed defendant with schizoaffective disorder and antisocial personality disorder. During an interview in July 2014, defendant told Dr. French that he was hearing voices on the right side of his head before he stabbed Collins, but he did not remember what they said. When asked if he could explain the connection between the voices and the stabbing, defendant said, "[N]o, I can't. She was stabbed?" Defendant also said, "I was really stressed out. I was in town where I didn't know nobody. There was nothing but Whites and Hispanics and I feared for my life." When he was asked why he had chosen Collins, defendant replied, "Why anybody? It could have happened to anybody."

Dr. French also testified regarding the police interview in which defendant described how poorly he had been treated by women and his mission to let society know how miserable he was by taking a life. Defendant told the police about a dozen times that he did not feel good about what he did, but he also stated that he had to complete his mission and he felt relieved after killing Collins. Defendant told the officers that he understood that what he did was legally wrong and he agreed with the statement that what he did was morally wrong. Dr. French read a portion of the transcript of the police interview in which defendant talked about free will and why his life had been designed as it had been. Dr. French characterized defendant's observations as profound. Defendant's statements to the police were "[v]ery significant" to Dr. French in concluding that defendant was sane at the time of the crime. He explained that there was no evidence of active psychosis, and defendant never lost his composure during the lengthy interview. Since the interview was closest in time to the incident, it was the "best window" into defendant's state of mind.

Dr. Burdick, a psychologist, evaluated defendant twice in June 2014 and once in August 2014. Dr. Burdick saw no signs of schizophrenia or schizoaffective disorder at his first interview with defendant. Defendant told him that he had never murdered anyone. He stated that a bald, black man[6] was stabbing a woman and he tried to get the knife away from him. Defendant then helped her to the ground. Defendant also mentioned that there were some voices coming from skeletons, who were on his left and on his right. He did not really understand what the voices were saying, but it was something about killing. They were not commanding him to do anything. When Dr. Burdick asked defendant if killing was wrong, he twice replied, "yes, it's wrong" in an emphatic tone of voice. Defendant also asked Dr. Burdick "how [he] thought it went" and "if [he] believed him."

[Footnote 6:] Defendant is a bald, African-American man.

At the second interview, defendant told Dr. Burdick that he did not have hallucinations at the time of the murder. However, he had hallucinations from time to time depending on his medication. Defendant told him that he had admitted to the police that he had killed the victim, but it was only after they had worn him down after a three-hour interview.

Dr. Burdick testified regarding the police interview. He thought it was important that defendant admitted killing Collins at the beginning of the interview. Dr. Burdick also noted that defendant was lucid during most of the interview. Dr. Burdick

4

> concluded that defendant had a mental illness, he understood the nature and quality of his actions, and he knew what he did was legally and morally wrong.

*People v. Edwards*, 11 Cal. App. 5th at 762-65.

Having been convicted of first degree murder with sentence enhancements, and having been found sane at the time of the offense, Edwards was sentenced on March 25, 2015, to 88 years to life in prison.

Edwards then appealed. The California Court of Appeal affirmed his conviction in a reasoned decision issued on May 16, 2017. The California Supreme Court summarily denied his petition for review on August 16, 2017.

He then filed this action. In his federal petition for writ of habeas corpus, he alleges that his Fifth, Sixth and Fourteenth Amendment rights were violated when (1) the court allowed the prosecution to impeach a defense expert with Edwards' statements; (2) the trial court allowed the prosecutor to impeach third-party witnesses with illegally obtained statements Edwards had made to police; and (3) counsel failed to object to the testimony of the prosecution witness at the sanity phase of the trial. The court agrees with respondent's assertion that the first and second claims are actually a single claim and therefore evaluates them as a single claim.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Cruz County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**LEGAL STANDARD**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated

on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the

6

federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id*. at 102.

**DISCUSSION**

A. <u>Use of Edwards' Statements To Cross-Examine Experts At Sanity Phase Of Trial</u>

Statements were taken from Edwards in violation of his *Miranda* rights. The question in this case is whether those statements could be used to impeach psychiatrists who were testifying for the defense at the sanity phase of his trial. Edwards argues that his Fifth, Sixth, and Fourteenth Amendment rights were violated by the use of those statements at the trial.

1. <u>State Court Proceedings</u>

When he was arrested, Edwards was advised of his *Miranda* rights and thereafter was interviewed by the police who disregarded his request to speak to counsel.

He moved *in limine* to suppress his statements to the police officers on the ground that he had invoked his right to counsel during the interview yet the police continued to speak with him. CT 315. The prosecutor moved *in limine* to allow the evidence in at trial and to allow expert witnesses at the sanity phase to refer to the content of Edwards' statements if those statements formed the basis of their opinions. CT 390. The trial court ruled that the statements made by Edwards after he invoked his right to counsel were inadmissible as evidence in the case-in-chief in both the guilt and sanity phases. The trial court also ruled that if the defense expert witnesses in the sanity phase relied on statements that defendant had made to them, the prosecutor could impeach the expert witnesses with defendant's inconsistent statements made to the police that otherwise had been suppressed.

As a result of the trial court's rulings, Edwards' statements to the police were admitted as impeachment evidence at the sanity phase.[1] As mentioned in more detail in the preceding section, evidence was introduced that showed, among other things, that Edwards' statements to the police were inconsistent with his later statements to the defense psychiatrists. For example, whereas Edwards had reported to the psychiatrists in 2014 that he was hearing voices from skeletons telling him to kill Collins when he stabbed her in 2012, when he was interviewed by the police on the day of the killing, Edwards (a) had not mentioned the presence of skeletons or command hallucinations; (b) said he planned to kill a woman because he was frustrated that women did not give him enough attention; and (c) decided not to kill a teenager or a woman with a child. Dr. Gould, a defense psychiatrist, conceded that Edwards' statements to him were inconsistent with Edwards' statements to the police and to the prosecution's experts, raising concerns as to which version was valid. Dr. Gould testified that Edwards' statements to the police suggested the defendant understood the nature of his act and knew legal and moral right from wrong at the time of the murder. Dr. Gould also believed the statements to the police were most likely to be the most reliable because they were made near in time to the killing. Dr. Greene, the other defense psychiatrist, thought there was evidence of psychosis in Edwards' interview with the police. The two psychologists who testified for the prosecution found support for their conclusions that Edwards was sane based on his statements to the police.

On appeal, Edwards argued that his *Miranda*-violative statements to the police should not have been admitted at the sanity phase of his trial. The California Court of Appeal rejected Edwards' federal constitutional challenge to the use of his statements to the police. (The state appellate court's reasoning will be discussed in more depth in the next section.)

---

[1] The trial court gave a limiting instruction during the experts' testimony: "'Statements offered by [defendant] to law enforcement are not being offered for the truth of the matter asserted but they're being offered for part of the basis upon which an expert like Dr. Gould is offering his opinion. So it's being offered for a limited purpose in that regard.'" *People v. Edwards*, 11 Cal. App. 5th at 766 n.7 (alteration in original).

2. <u>Analysis</u>

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966), requires that a suspect be given certain warnings and must waive those warnings before he may be subjected to a custodial interrogation. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479; *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (referring to the "*Miranda* exclusionary rule"). Although statements obtained in violation of *Miranda* must be excluded in the prosecution's case-in-chief at a later trial, they may be used to impeach the credibility of a testifying defendant. *See Harris v. New York*, 401 U.S. 222, 225 (1971). The Supreme Court has limited the use of a defendant's statements for impeachment purposes by holding that the impeachment exception does not extend to third parties, i.e., a third party cannot be impeached with a defendant's statements obtained in violation of the defendant's *Miranda* rights. *See James v. Illinois*, 493 U.S. 307 (1990). Because Edwards' claim turns on the interpretation of *James*, that case will be examined in more depth.

In *James*, the day after a shooting, the defendant was found by police at his mother's beauty parlor, where he emerged from under a hair dryer with curly black hair. 493 U.S. at 309. During questioning at the police station, the defendant stated that he "had gone to the beauty parlor in order to have his hair 'dyed black and curled in order to change his appearance.'" *Id.* His statements were ruled inadmissible as the fruit of a Fourth Amendment violation because the police lacked probable cause to arrest him without a warrant. *Id.* At the time of trial, defendant had black hair worn in a "'natural'" style. *Id.* At trial, several eyewitnesses made in-court identification of the defendant as the shooter but also testified that the person responsible for the shooting had shoulder-length and slicked-back reddish hair. *Id.* at 310. The defendant did not testify and therefore could not be questioned about his statement to police that he had gone to the beauty parlor to change his appearance the day after the shooting. But the defense called a family friend, who testified that she was with the defendant on the day of the shooting and he had black hair on that day. *Id.* Over the defendant's objection, the prosecutor then introduced the defendant's "illegally obtained statements as a means of impeaching the credibility" of the friend. *Id.* A police detective was allowed to testify that the defendant admitted he had reddish hair the night of the shooting and had died and curled it

9

the next day to change his appearance. *Id.*

The Supreme Court in *James* put a limit on the impeachment exception to the exclusionary rule. Whereas the impeachment exception generally permits the prosecution to introduce illegally obtained evidence for the limited purpose of impeaching the credibility of the defendant's own testimony, *id.* at 311-12, the Court in *James* refused to expand the class of impeachable witnesses from the defendant alone to all defense witnesses. *Id.* at 313. The Court explained that expanding the class of impeachable witnesses to include all defense witnesses "would create different incentives affecting the behavior of both defendants and law enforcement officers." *Id.* Consequently, it "would not promote the truthseeking function to the same extent as did creation of the original exception, and yet it would significantly undermine the deterrent effect of the general exclusionary rule." *Id.* at 313-14. The Court considered several reasons for not expanding the impeachment exception. The availability of a defendant's statements to deter perjurious testimony by the defendant did not apply with equal force to other witnesses, and could impede the presentation of a defense because the defense might not call some witnesses who purposely or inadvertently could open the door to the introduction of evidence of statements illegally obtained from the defendant. *Id.* at 314-15. Also, concerns about weakening the exclusionary rule's deterrent effect counseled against allowing a statement illegally obtained from the defendant to be used to impeach other witnesses. *Id.* at 317-19.

In the present case, the California Court of Appeal concluded that the rationale of *James* did not support the exclusion in the sanity phase of Edwards' statements obtained in violation of *Miranda*:

> Here, the use of defendant's illegally obtained statements to impeach the expert witnesses during the sanity phase promotes the same truth-seeking function of a criminal trial as the impeachment exception of a defendant who testifies. Though there is little, if any, concern that expert witnesses would commit perjury,[8] the admission of this evidence prevents the defendant from turning the exclusionary rule into a "a shield against contradiction of his untruths." (*Harris, supra*, 401 U.S. at p. 224, 91 S.Ct. 643, quoting *Walder, supra*, 347 U.S. at p. 65, 74 S.Ct. 354.) Nor would the admission of the suppressed statements have a chilling effect on a defendant's ability to present a defense. Defendants could avoid impeachment of the testimony of expert witnesses by not providing these witnesses with statements that contradict the suppressed statements. Defendants could reasonably expect that expert witnesses, given their professional qualifications, would not testify in a manner that intentionally or inadvertently invited impeachment. Expert witnesses

10

    also generally provide reports prior to trial, thereby allowing adequate preparation by defendants. Moreover, the number of expert witnesses at a criminal trial is usually fewer than other third party witnesses. Thus, in contrast to *James*, the expansion of the impeachment exception to the cross-examination of expert witnesses during the sanity phase would further the truth-seeking process with minimal loss of probative witness testimony.

> [Footnote 8:] The defense witness in *James* testified as to her own observations while, here, the witnesses testified as experts. "An expert witness may be cross-examined about 'the matter upon which his or her opinion is based and the reasons for his or her opinion,'" and "an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 434, 87 Cal.Rptr.3d 209, 198 P.3d 11.) When the expert accurately testifies regarding the defendant's statements to him, even if they are false, there is no threat of a perjury prosecution.

    We are also not persuaded that this type of evidence would diminish the deterrent effect of the exclusionary rule on police misconduct. As with the impeachment exception established under *Harris*, an officer's incentive to gather evidence by illegal means would be weak. Such an incentive would rely on the unlikely prediction that a defendant would later provide inconsistent statements to an expert, who would then basis his opinion as to the defendant's sanity on these statements. [Footnote omitted.] Moreover, unlike in *James*, the expansion of the exception would not significantly increase the number of occasions on which the prosecutor could use such evidence.

    The admission of a defendant's illegally obtained statements to impeach an expert witness regarding inconsistent statements made by the defendant and relied on by the expert witness as a basis for his or her opinion furthers the truth-seeking function of a trial without diminishing the deterrent effect of the exclusionary rule on police misconduct. Thus, the trial court properly admitted the evidence.

*People v. Edwards*, 11 Cal. App. 5th at 768-69.

    The California Court of Appeal's decision was not contrary to or an unreasonable application of clearly established law, as set forth by the U.S. Supreme Court. *James* did not specifically address the use of unlawfully obtained statements in the context of expert witness testimony, nor in the context of a sanity phase of a trial. It was not unreasonable for the California Court of Appeal to determine that those two factors made a difference, and supported a conclusion that the *James*' Court's refusal to extend the impeachment rule to other defense witnesses should not cover expert witnesses at a sanity trial.

    The Ninth Circuit relied on similar reasoning to that of the California Court of Appeal when it rejected a defendant's challenge to the use of a statement obtained in violation of *Miranda* to impeach a psychiatrist's testimony about a defendant's lack of specific intent in *United States v.*

*Rosales-Aguilar*, 818 F.3d 965 (9th Cir. 2016). In *Rosales-Aguilar*, the defendant was charged with two counts of attempted illegal reentry based on two attempts in three days to enter the United States from Mexico. *Id.* at 968. On the first occasion, he told Border Patrol agents that he was entering to find work and live in the United States; on the second occasion, he told them that he had climbed over the border fence and was on his way to San Diego. *Id.* The district court suppressed the first statement because *Miranda* warnings had not been given and suppressed the second statement because the waiver of the *Miranda* rights was not knowing; the district court also ruled that both statements could be used for impeachment purposes. *Id.* At trial, the defendant did not testify but did have a psychiatrist testify as an expert witness about the defendant's mental state (i.e., that the defendant lacked the requisite specific intent for illegal reentry because he was under the influence of drugs) based on statements the defendant had made to the psychiatrist. *Id.* at 969. The district court allowed the government to use the defendant's suppressed statements to cross-examine the expert witness psychiatrist. The Ninth Circuit affirmed the conviction, finding that *James* was distinguishable because the witness in *James* "was testifying as to her own perception and recollection," whereas "the statements impeached here were not the observations of [the psychiatrist] as to Rosales's activities on the day he was arrested. Rather, they were Rosales's account of the events as communicated to [the psychiatrist]. . . . It was Rosales's perception, recollection and veracity that were being impeached by Rosales's own prior inconsistent statements." *Rosales-Aguilar*, 818 F.3d at 970. The Ninth Circuit explained that this case was "much closer" to cases where the defendant's own statements were allowed to impeach the defendant.

> "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U.S. at 226, 91 S.Ct. 643. Insofar as Rosales's statements to [the psychiatrist] differ from the ones he made to the Border Patrol officers, the inconsistencies cast doubt on *his* veracity, not [the psychiatrist's]. They were thus properly admitted to impeach Rosales's account of the events under dispute.

*Rosales-Aguilar*, 818 F.3d at 970.

Similarly, Edwards' statements were being offered to impeach Edwards' perception, recollection, and veracity rather than that of the psychiatrists who had evaluated him. Consider, for example, Edwards' statement that he stabbed the victims because he was told to do so by skeletons. The defense psychiatrists gave an opinion as to Edwards' sanity based on Edwards' report that he stabbed the victim because skeletons told him to do so. The prosecution was able to ask how that opinion was affected by Edwards' statement to police just after the killing that he stabbed the victim because women had spurned him. The latter statement did far more to impeach the credibility of Edwards than the credibility of the experts. The statement to police cast doubt on the truthfulness of Edwards' account to the experts. In *James*, the use of the defendant's illegally obtained statement cast doubt on the truthfulness of the witness because the witness said the defendant had black curly hair on the day of the killing whereas the defendant had admitted to police that he had gotten that black curly hair the day after the killing to change his appearance. By contrast, the use of the illegally obtained statement in the present case did not similarly cast doubt on the truthfulness of the defense psychiatrists.

Allowing the jury to hear Edwards' statements to police promoted the truth-seeking purpose of the trial, much more so than would have occurred if the statements he made immediately after the killing could not be used by the experts. The jury was instructed in the sanity phase about expert witness testimony. CT 1494. Part of the instruction stated: "[C]onsider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate." CT 1494. The instruction also stated: "If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied." *Id.* Disallowing use of Edwards' statements to the police would have distorted the truth-seeking purpose of the sanity trial as it would have deprived the parties of information about statements highly relevant to Edwards' state of mind on the day he killed the victim.

13

It was not an unreasonable application of *James* for the California Court of Appeal to refuse to apply *James* to the situation where an expert was testifying in a sanity trial and was basing his opinion on the defendant's self-reporting of his reasons for his actions.

B.  Ineffective Assistance of Counsel

Edwards contends that he received ineffective assistance of counsel because "counsel failed to object to the testimony of the prosecution witness at the sanity phase of the petitioner[']s trial." Docket No. 1 at 5. In his traverse, he argues that counsel "did not undertake any preparation or advocacy to challenge the alleged inconsistencies in Dr. French's opinion" that Edwards was sane at the time of the murder. Docket No. 29 at 7. Edwards offers nothing more specific than these two statements.

Respondent argues that this constitutional claim is unexhausted but nonetheless should be rejected on the merits. The court agrees.

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). Here, the federal constitutional claim is unexhausted because Edwards did not present it to the California Supreme Court. *See* Docket No. 28-10 at 275 (petition for review filed in California Supreme Court). A district court may deny, but not grant, relief on a habeas petition that presents an unexhausted claim. See 28 U.S.C. § 2254(b)(1). The district court can deny an unexhausted claim only when "it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005). This court will deny relief on the unexhausted federal constitutional claim because the claim is plainly meritless.

The Sixth Amendment guarantees not only assistance, but the effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

14

of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must satisfy a two-prong test. First, he must establish that counsel's performance was deficient. *Id.* at 687. A deficient performance is one that falls below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance; he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Edwards' claim that counsel provided ineffective assistance fails on both the deficient-performance prong and the prejudice prong of the *Strickland* analysis. Edwards contends in his traverse that counsel did not prepare for or challenge inconsistencies in Dr. French's opinion that Edwards was sane. The record plainly shows this not to be true, as counsel tried various means to undercut Dr. French's testimony. Defense counsel filed motions *in limine* to exclude all mention of Edwards' statements to the police, which would have cut into the basis for Dr. French's opinion if the motions had been successful. *See* CT 376, 484, 592, 609. During the sanity phase, defense counsel made some objections during direct examination of Dr. French by the prosecutor (*e.g.,* RT 9014, 9020, 9041), cross-examined Dr. French at length (RT 9061-9147), and even did a brief direct examination of Dr. French (RT 8888-8895). Edwards fails to identify any specific way in which defense counsel failed to prepare for or challenge Dr. French's opinion, nor does he show resulting prejudice. In his petition, Edwards contends that counsel failed to object to the testimony of an unspecified prosecution witness in the sanity phase. Insofar as he is referring to Dr. French's testimony, Edwards fails to identify the objection that counsel should have made and fails to show that there is any reasonable probability that the outcome would have been different if counsel had made the objection. Insofar as Edwards is referring to some other witness, his argument fails because he does not identify who that witness was, what the basis for an objection would have been, why the objection would have been successful, and how a sustained objection would have made any difference at his trial. The unexhausted claim that counsel provided ineffective assistance in the

sanity phase is denied.

C. No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is DENIED.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: March 26, 2019

SUSAN ILLSTON
United States District Judge